IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

RUSSELL BURNETT
*Defendant*.

Criminal No.:  ELH-09-573

**MEMORANDUM OPINION**

Defendant Russell Burnett pled guilty in April 2010 to one count of production of child pornography.  *See* ECF 23; ECF 24.  In July 2010, Judge William Quarles, Jr., to whom the case was then assigned, sentenced Burnett to 180 months of imprisonment.  *See* ECF 30.[1]

Burnett, who is now self-represented, has filed a motion for compassionate release (ECF 72), along with two supplementary filings.  *See* ECF 75; ECF 80.[2]  I shall refer to ECF 72, ECF 75, and ECF 80 collectively as the "Motion".  Defendant claims that, in light of the COVID-19 pandemic, his various medical conditions present an extraordinary and compelling circumstance that warrants his release from prison.  ECF 72 at 1. The government opposes the Motion.  ECF 82 (the "Opposition").  Defendant has replied.  *See* ECF 85; ECF 86.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

---

[1] Due to the retirement of Judge Quarles, the case was reassigned to me on June 16, 2016.

[2] The Office of the Public Defender represented defendant initially, but has declined to represent Burnett in regard to the Motion.  *See* ECF 74.

## I. Background

On November 6, 2009, Burnett was indicted on one count of production of child pornography, in violation of 18 U.S.C. § 2251(a).  ECF 1.   At the time, defendant was in State custody.  *See* ECF 87 at 1.  He had his initial appearance in federal court on January 19, 2010. ECF 7.

Pursuant to a plea agreement (ECF 24, the "Plea Agreement"), defendant pled guilty on April 16, 2010.  ECF 23.  The plea was entered under FED. R. CRIM. P. 11(c)(1)(C) ("C Plea"). ECF 24, ⁋ 8.

The Plea Agreement included an agreed Statement of Facts.  *Id.* ⁋ 5(a).  It provided that in late April 2009, police officers with the Fruitland Police Department began an investigation into reports of sexual assaults committed against several minors in Fruitland, Maryland.  *Id.*  Through the officers' work, "it became apparent that [Burnett] had inappropriately touched some of the children" and "had photographs of some of the children in unclothed or partially unclothed states." *Id.*  Pursuant to a search warrant, police officers conducted a search of Burnett's residence.  *Id.* Upon their arrival, officers found Burnett disassembling one of his computers.  *Id.*  The officers seized several of Burnett's computers, peripheral devices, storage media, and associated items.  *Id.*

"Forensic reviews of the material revealed, among other images of child pornography, a video recording made in or about June 2005 of one of the neighborhood minor females known to Burnett."  *Id.*   The parties stipulated that "Burnett had invited and enticed [the minor] to come into his house . . . with the intention of producing pornographic images of her."  *Id.*  In the video, the minor, who was about eight years old at the time, "is seen undressing and the camera focuses on her genital region when she complies with a directive to spread her legs."  *Id.*  "Burnett is clearly

visible in this video clip . . . ." *Id.* Moreover, the electronic media seized from Burnett's residence contained images depicting "Burnett . . . touching the inner thigh and body of the [minor]." *Id.*

The Plea Agreement contemplated a base offense level of 32, pursuant to Section 2G2.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). ECF 24, ¶ 5(b)(i). Because the victim in this case was under the age of 12 at the time of the offense, the offense level was subject to a four-level increase, pursuant to § 2G2.1(b)(1)(A). *Id.* Moreover, the parties agreed that, in accordance with § 2G2.1(b)(2), there was an additional two-level increase to defendant's offense level "because the offense involved the commission of sexual contact." *Id.* With three deductions for defendant's acceptance of responsibility, the parties contemplated a final offense level of 35. *Id.* ¶¶ 5(b)(i)-(ii).

There was no agreement as to defendant's criminal history or criminal history category. *Id.* ¶ 6. But, the parties agreed that a sentence of 180 months' imprisonment was the appropriate disposition of this case, in light of the sentencing factors in 18 U.S.C. § 3553(a). *Id.* ¶¶ 7, 8. That corresponded to the mandatory minimum term of imprisonment under 18 U.S.C. § 2251(e).

At the time of sentencing, Burnett was serving a 15-year State sentence on related charges. ECF 87 at 1. In the Plea Agreement, defendant "reserve[d] the right to request that some or all of any term of incarceration imposed run concurrently with the remainder of the undischarged term of state imprisonment." *Id.* ¶ 8. However, the government stated that it would "oppose such a request." *Id.*

A presentence report ("PSR") was submitted to the Court. ECF 87.[3] It reflected that defendant, born on October 26, 1965, *id* at 1, had four prior adult criminal convictions. *Id.* ¶¶ 31-

---

[3] The PSR was signed on June 21, 2010. This Court located it in the Chambers file and had it docketed on October 29, 2021.

36.  In sum, the PSR indicated that defendant had a criminal history score of 6 and a criminal history category of III.  *Id.* ¶ 38.

In particular, in December 1986, Burnett, who was then 21 years old, pled guilty in the Circuit Court for Montgomery County, Maryland to two counts of arson.  *Id.* ¶ 32.  He was sentenced to twenty years' incarceration, with all but eighteen months suspended, and a five-year term of probation.  *Id.*  Defendant's probation began on February 18, 1988.  *Id.*

Nearly two years later, on December 11, 1989, defendant was arrested on charges of petty theft and making a false statement to a police officer.  *Id.* ¶ 34.  On March 9, 1990, Burnett was convicted of both charges.  As to the theft, he was sentenced to 18 months' imprisonment, with all but two months suspended, with a fourteen-month term of probation.  *Id.*  The offenses did not score points, however.  Defendant was later found to have violated the terms of his probation in the arson case.  *Id.* ¶ 32.

Then, on May 1, 2009, Burnett was arrested on State charges related to the instant offense. *Id.* ¶ 35. Thereafter, he entered a guilty plea in the Circuit Court for Wicomico County, Maryland, to three counts of a sex offense in the third degree.  *Id.*  He was sentenced to three consecutive sentences of ten years' incarceration, each with five years suspended, and three years' probation. *Id.*  Thus, at the time of sentencing in federal court, defendant was serving a fifteen-year State sentence.  *Id.* at 1.

The PSR also reflected that defendant had a troubled childhood.  Among other things, Burnett indicated that his father was physically abusive.  ECF 87, ¶ 53.  Moreover, he advised that his mother had told him that he had been sexually molested as young child, although she never told him who committed the abuse, and he could not remember its occurrence.  *Id.*

As reported in the PSR, Burnett had been married since 1988.  He had one stepdaughter and two step-grandchildren.  *Id.* ¶ 54.  But, defendant asserted that, after his arrest for the instant offense, his wife advised him of her intention to move to Florida.  *Id.*  He had no contact with her as of December 2009.  *Id.*

Defendant claimed to be in good health.  He had no substance abuse issues.  *Id.* ¶¶ 59-61.  Burnett also asserted that he obtained a GED in 1983.  *Id.* ¶ 64.

At the time of sentencing on July 7, 2010 (ECF 30), Burnett was 44 years old. ECF 87 at 1.  Based on a final offense level of 35 and a criminal history category of III, the Guidelines called for a period of imprisonment ranging from 210 to 263 months.  ECF 31 at 1.  And, as noted, the offense of conviction was subject to a mandatory minimum sentence of fifteen years' imprisonment.  *See* ECF 87, ¶ 55; *see also* 18 U.S.C. § 2251(e).

Consistent with the terms of the C Plea, Judge Quarles sentenced Burnett to the mandatory minimum term of 180 months of imprisonment.  ECF 30.  Notably, the sentence was to begin on the earlier of defendant's release from the undischarged term of his State imprisonment or January 7, 2013.  *Id.* at 2.  In addition, Judge Quarles placed Burnett on lifetime supervised release.  *See id.* at 3.  No appeal was lodged.

In the Statement of reasons (ECF 31), Judge Quarles noted that the defendant's conduct in the State case involved three minors.  *Id.* at 4.  He also referenced "the intractability of pedophilia . . . ." *Id.*

Defendant remained in State custody as of January 7, 2013.  ECF 35.  Therefore, Judge Quarles wrote to the Bureau of Prisons on February 6, 2013, recommending that defendant's sentence run concurrent with his State sentence as of January 7, 2013.  ECF 36.  And, in the Opposition, the government confirms that Burnett's federal sentence began to run as of that date.

*See* ECF 82 at 2.  In effect, because the fifteen-year sentence imposed in July 2010 did not begin until January 2013, defendant's federal sentence was partially consecutive to his State sentence.

On June 15, 2016, Burnett filed correspondence with the Court, which I construed as a post-conviction motion to vacate, pursuant to 28 U.S.C. § 2255.  ECF 45.  Thereafter, defendant submitted a supplementary "§ 2255 packet."  ECF 49.  By Memorandum (ECF 61) and Order (ECF 62) of July 13, 2017, I denied the motion as untimely.  Burnett noted an appeal to the Court of Appeals for the Fourth Circuit (ECF 64), which affirmed in a per curiam opinion.  *See* ECF 66.

Defendant is currently serving his sentence at Fort Dix FCI.  *See* ECF 84; *Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Nov. 16, 2021).[4]  He has a projected release date of March 28, 2025.  *See Find an Inmate*, *supra*.  To date, he has served approximately 58% of his fifteen-year sentence.

On November 15, 2020, the Office of the Public Defender (the "OPD") filed a letter with the Court indicating that it would not be supplementing the Motion.  ECF 74.  But, the OPD provided documentation reflecting that defendant had submitted a request for compassionate release to the Warden on August 14, 2020.  ECF 74-1.  The Warden denied Burnett's request on September 2, 2020.  *Id.*

As noted, defendant has submitted multiple filings with the Court.  Characterized broadly, they reassert the basis of his claim for compassionate release and provide the Court with updates regarding the condition of his health.  *See* ECF 75; ECF 80; ECF 85; ECF 86.  Notably, Burnett indicates that he has been fully vaccinated against COVID-19.  ECF 85 at 1.  He also indicates

---

[4] The Motion indicates that, at the time of filing, defendant was serving his sentence at Elkton FCI.  *See* ECF 72 at 2.  But, in a later submission, defendant reported a change of address to Joint Base MDL, an air base where Fort Dix FCI is located.  ECF 84; *see FCI Fort Dix*, Federal Bureau of Prisons https://www.bop.gov/locations/institutions/ftd/.

that, upon his release, he plans to live with his brother and his brother's wife in Silver Spring, Maryland.  ECF 80 at 1.

## II.      Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  Originally, a court was permitted to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and

compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:

> (A)    **Medical Condition of the Defendant**.—

> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

> (ii) The defendant is—

(I)  suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III)  experiencing deteriorating physical or mental health because of the aging process,

      that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy

statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283.  Therefore, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'"  *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F.Supp.3d 562, 565 (W.D. Va. 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district

court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).

To be sure, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *United States v. High*, 997 F.3d 181, 187 (4th Cir. 2021) (internal quotation marks omitted).

### B.  COVID-19[5]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6] Defendant filed his motion for compassionate release in February 2021.  At that time, as now, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

---

[5] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis.  This is because the virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  As of November 16, 2021, COVID-19 has infected more than 47 million Americans and caused approximately 767,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Nov. 16, 2021).

Although this country saw a reduction of COVID-19 cases in prior months, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough*

*Infections and the Delta Variant*, N.Y. Times (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months"). Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants").

But, in recent weeks, the trend has again become more favorable. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. Times, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, Wall St. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."). Even so, health authorities warn that there remain reasons for caution, including the relatively low levels of vaccination in some parts of the country, as well as an expected increase in the number of indoor gatherings, where the virus can more easily spread, due to the encroachment of colder weather and the impending holiday season. *See* Kamp & Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19 to reflect the most available data, most recently in October of 2021.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Oct. 14, 2021), https://bit.ly/38S4NfY. [hereinafter *Certain Medical Conditions*]. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), bronchiectasis, bronchopulmonary dysplasia (chronic lung disease affecting newborns), interstitial lung disease, cystic fibrosis, and pulmonary embolism; pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathy, and hypertension; HIV; being immunocompromised; liver disease; mood disorders, including depression and schizophrenia spectrum disorder; obesity, with a body mass index ("BMI") of 25 or higher; pregnancy; sickle cell disease or thalassemia; smoking (current or former); solid organ or blood stem cell transplant; stroke or cerebrovascular disease; substance use disorders; and, tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL &

PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, the CDC cautions that the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective

equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[7]

---

[7] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

---

people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.).  On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since expanded considerably, and the vaccine was recently approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.  Approximately 69% of all persons twelve years of age and older are fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Nov. 16, 2021).  And, 59% of the total U.S. population is fully vaccinated.  *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines

on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff,*
*Inmates        Soon        Thereafter*,        Forbes        (Dec.        21,        2020),
https://www.forbes.com/sites/walterpavlo/2020/12/21/        federal-bureau-of-prisons-starts-
vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.

As of November 16, 2021, the BOP reported that 118 inmates, out of a total 133,717 federal
inmates, and 259 BOP staff, out of some 36,000 staff members, tested positive for COVID-19;
42,369 inmates and 8,410 staff have recovered from the virus; and 267 inmates and seven staff
members have died from the virus. Moreover, the BOP has administered 250,713 vaccine doses
to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Nov. 16, 2021).

With respect to Fort Dix FCI where defendant is imprisoned, the BOP reported that as of
November 16, 2021, out of a 3,190 total of inmates, one has tested positive. And, five staff
members have tested positive for COVID-19, and 1,625 inmates and 101 staff have recovered at
the facility. In addition, 2,078 inmates, as well as 274 staff members, have been fully inoculated
with the vaccine. *See* https://www.bop.gov/coronavirus/, *supra*; *FCI Fort Dix*, Federal Bureau of
Prisons, http://www.bop.gov/locations/institutions/ftd (last visited Nov. 16, 2021).

### IV. Discussion

### A.

Burnett, who is now fifty-six years of age, has moved for compassionate release on the
ground that his underlying health conditions render him particularly vulnerable to COVID-19 and
constitute an extraordinary and compelling reason that warrants his release from prison. ECF 72.
Specifically, defendant advises that he suffers from hypertensive heart disease, stomach and
duodenal ulcers, hyperlipidemia, hypertension, unspecified issues with his circulatory and
respiratory systems, and a urinary tract infection. *See id.*; ECF 75. Moreover, he submits that he

has a number of nodules throughout his body, including on his right thyroid, esophagus, spleen, throat, small intestine, and both lungs.  *Id.*  And, in his reply to the Opposition, Burnett reports that he is a former smoker.  ECF 85 at 2.  Defendant also contends that the prison's medical department has "known about [his] health problems and done nothing."  ECF 72 at 1.

The Court has not been provided with defendant's medical records.  However, the government avers that it has reviewed these documents and can confirm that they reflect "a history of high blood pressure, asymptomatic hyperintensive heart disease, high cholesterol (hyperlipidemia), and nodules on [defendant's] lungs."  ECF 82 at 4.  As such, the government concedes that defendant suffers from "some of the comorbidities of COVID-19 . . . ."  *Id.* at 19. But, it posits that these conditions "have been managed and treated by BOP medical personnel without serious difficulty, since 2013."  *Id.* at 4.  Furthermore, the Opposition reflects, and defendant concedes, that Burnett has received two doses of the Moderna COVID-19 vaccine.  *Id.* at 4, 19; *see* ECF 85 at 1.  Therefore, in the government's view, defendant's medical issues do not merit compassionate release.  *Id.* at 4.  The defendant agrees that he has been fully vaccinated against COVID-19.

As the government implies, some of defendant's health issues, such as his stomach and duodenal ulcers, urinary tract infection, and hyperlipidemia, are not considered by the CDC to be medical conditions that put Burnett at a heightened risk of severe disease from COVID-19.  *See Certain Medical Conditions*, *supra*.  But, the parties agree that Burnett's high blood pressure and heart disease (ECF 82 at 3-4) are conditions that, according to the CDC, "can make you more likely to get severely ill from COVID-19."  *Certain Medical Conditions*, *supra*.  Moreover, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in

an individual." *Id.* And, the CDC cautions that "[o]lder adults are more likely to get severely ill from COVID-19 . . . ." *Id.*

I cannot determine the medical significance of defendant's claim of nodules on various organs. But, I note that he is a former smoker. *See* ECF 85 at 2.

To be sure, defendant's vaccination reduces his risk of severe illness from the virus. But, it "does not negate that his underlying health conditions make him eligible for compassionate release." *United States v. Spriggs*, CCB-10-364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021). Furthermore, as recent developments make clear, the nature of the pandemic is continually evolving. For example, the CDC recently recommended that anyone over eighteen years of age and has a qualifying condition should receive a booster shot of an authorized vaccine in order to maintain their protection against the virus that causes COVID-19. *See CDC Expands Eligibility for COVID-19 Booster Shots*, CNTRS. FOR DISEASE CONTROL, Oct. 21, 2021, https://tinyurl.com/5bn52ydb, (last accessed Nov. 3, 2021).

Therefore, in light of the changing circumstances regarding COVID-19, coupled with defendant's age and uncontested medical issues, I am of the view that Burnett's vaccination status does not render him ineligible for compassionate release at this juncture. *See United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. Jul. 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specifical medical issues.").

Moreover, as I see it, defendant's health conditions are of sufficient severity so as to merit consideration for compassionate release. *See United States v. Carter*, CCB-16-235, 2021 WL 3725425, at *2 (D. Md. Aug. 20, 2021) (granting compassionate release to a vaccinated defendant who was obese and suffered from hypertension and Hodgkin's Lymphoma); *United States v.*

*Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that defendant's diabetes and hypertension constituted extraordinary and compelling circumstances, even though he had been fully vaccinated).  This determination does not resolve the Motion, however.

**B.**

Even where a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

In this case, the severity of the instant offense, Burnett's criminal history, and his time served to date all militate against granting the Motion.  *See Kibble*, 992 F.3d at 332-33 (finding district court was entitled to consider amount of time defendant served and the nature of the offense as factors in the § 3553(a) analysis).  Defendant's crime of conviction was, in a word, chilling.  As the government explains, Burnett "lured minors into his home to molest them and produce pornography."  ECF 82 at 24.

Defendant's criminal history is also of concern to the Court.  A review of his record reveals that defendant has previously spent substantial amounts of time in prison and served lengthy terms of probation.  *See* ECF 87, ¶¶ 31-34.  Yet, he was undeterred from engaging in the serious criminal conduct that led to his current term of imprisonment.

23

Burnett asserts that, upon release, he will live with his brother and his brother's wife.  ECF 80 at 1.  And, he reports that, while in State prison, he worked in the metal shop as a welder.  *Id.*  And, since his transfer to federal custody, he has "taken numerous classes."  *Id.*

According to defendant, but without reference to any authority, "sex offenders have the lowest rate of re-offending . . . ."  ECF 85 at 2.  But, defendant's various filings do not speak to his particular likelihood of reoffending.  And, he has not provided any information regarding his post-sentencing conduct, pertinent to his rehabilitation, such as his disciplinary record or any sex offender treatment he has received in prison.  *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (explaining that a defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's] 'history and characteristics.'") (quoting 18 U.S.C. § 3553(a)(1)).

Burnett was arrested on April 29, 2009.  *See* ECF 87 at 1.  But, because he was serving a 15-year State sentence on related charges, he did not get credit for his federal sentence from the date of arrest.  Moreover, although Judge Quarles imposed the sentence in July 2010, defendant did not begin to receive credit until about two-and-a-half-years later, in January 2013.  *See* ECF 30 at 2.

It has been roughly 106 months since January 7, 2013, the day on which defendant's federal sentence began to run.  *See id.*; ECF 36.  This represents approximately three-fifths of the fifteen-year sentence that Judge Quarles imposed.  *See* ECF 30.  However, accounting for the time Burnett has been in either State or federal custody for this offense and the related offenses, defendant has already been incarcerated for about twelve-and-a-half-years.  *See* ECF 87, ⁋ 35.

Nonetheless, as I see it, Burnett's release from prison is not warranted at this time, given the severity of his crime, his criminal history, and the absence of evidence as to his rehabilitation.

## IV.  Conclusion

For the reasons set forth above, I shall deny the Motion (ECF 72; ECF 75; ECF 80), without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: November 17, 2021                    _____/s/_____

                                           Ellen L. Hollander
                                           United States District Judge